Slip Op. 16 - 25

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| FUSHUN JINLY PETROCHEMICAL CARBON CO., LTD. and FANGDA CARBON NEW MATERIAL CO., LTD., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | |
| Defendant, | : | Court No. 14-00287 |
| | : | |
| and | : | |
| | : | |
| SGL CARBON LLC and SUPERIOR GRAPHITE CO., | : | |
| | : | |
| Defendant-Intervenors. | : | |

## OPINION

[Sustaining fourth administrative review of antidumping duty order on small diameter graphite electrodes from the People's Republic of China.]

Decided:  March 23, 2016

*Lizbeth R. Levinson* and *Ronald M. Wisla*, Kutak Rock LLP, of Washington DC, for the plaintiffs.

*Melissa M. Devine*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for the defendant.  With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of Counsel on the brief was *Nanda Srikantaiah*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*David A. Hartquist*, *R. Alan Luberda*, and *Brooke M. Ringel*, Kelley Drye & Warren LLP, of Washington DC, for the defendant-intervenors SGL Carbon LLC and Superior Graphite Company.

Musgrave, Senior Judge:  This opinion addresses challenges brought by the plaintiffs Fushun Jinly Petrochemical Carbon Co., Ltd. ("Fushun") and Fangda Carbon New Material Co., Ltd. ("Fangda") to *Small Diameter Graphite Electrodes from the People's Republic of China: Final Results of Antidumping Duty Review; 2012-2013*, 79 Fed. Reg. 57508 (Sep. 25, 2014) ("*Final Results*") as reasoned in the accompanying issues and decision memorandum ("IDM").  Substantial evidence of record, however, supports the *Final Results* on those challenges.

*Background*

The matter concerns the fourth administrative review of the order on subject merchandise,[1] as determined by the International Trade Administration, U.S. Department of Commerce ("Commerce").  After the review's March 29, 2013 initiation, Commerce selected Fushun and Fangda as mandatory respondents, PDoc 16, and published preliminary results on March 24, 2014.  *Small Diameter Graphite Electrodes from the PRC*, 79 Fed. Reg. 15994 (Mar. 24, 2014) (prelim. determ.), PDoc 228 ("*Preliminary Results*"), and accompanying preliminary decision memorandum, PDoc 222 ("PDM").

Concerning two of the issues brought here, Commerce preliminarily found that Fushun had withheld or misrepresented information and had impeded the review, and accordingly applied "total" facts available with an adverse inference after disregarding Fushun's submissions. PDM at 4-7; CDoc 243 ("AFA Memo").  As a consequence, because Fushun had not demonstrated

---

[1]  *See Antidumping Duty Order: Small Diameter Graphite Electrodes from the PRC* (hereinafter "PRC"), 74 Fed. Reg. 8775 (Feb. 26, 2009).

its separation from the PRC government, Commerce preliminarily determined that Fushun was also subject to the 159.64 percent PRC-wide margin.  PDM at 7; AFA Memo at 14.

Concerning one of the other challenges brought here, after the Ukraine was selected as the primary surrogate country Commerce granted Fangda a by-product offset for its forming scrap by-product and valued it with the Ukrainian Harmonized Tariff Schedule ("HTS") item 2713.12 for "Petroleum Coke, Calcined."  PDM at 23; IDM at 31.

Fushun and Fangda submitted administrative case briefs after publication of the *Preliminary Results*.  Fangda's brief objected to Commerce's valuation of its "forming scrap" by-product, arguing that the Ukrainian value was aberrational, and it also challenged Commerce's VAT methodology.  CDoc 251. Fushun's brief was rejected on the ground that it improperly contained new factual information, and its revised brief challenged Commerce's determination to apply total facts available with an adverse inference. CDoc 254.  In a separate submission, Fushun requested that Commerce reconsider its rejection of the original brief, arguing that the rejection deprived it of the opportunity to comment on the impact of the final determination on liquidation instructions with respect to a certain customer.  CDoc 256.

On September 25, 2014, Commerce published its *Final Results*.  79 Fed. Reg. 57508. Commerce continued to apply total facts available with an adverse inference to Fushun, *see* IDM at 8-13, and continued to find that the Ukrainian value for Fangda's forming scrap by-product was appropriate, *see id.* at 30-36.  Commerce also rejected Fushun's request to reconsider its rejected case brief arguments and Fangda's challenge to its VAT methodology.  *Id.* at 2-3, 22-25.  Commerce made no changes to either party's margin.  *See Final Results*, 79 Fed. Reg. at 57509.

The plaintiffs then brought suit here, challenging (1) the selection of the surrogate price for valuing the factors of production for forming scrap, arguing that Commerce's selection is aberrational and unsupported by substantial evidence, (2) the deduction of non-refunded value added taxes ("VAT") from U.S. price as not in accordance with law, (3) the application of total adverse facts available to Fushun, arguing that substantial evidence does not support finding that Fushun concealed or withheld information, and that the (4) Fushun deserved a separate rate. In addition, Fushun urges the court (5) to fashion a remedy to exclude an importer that did not purchase merchandise from Fushun during the period of review ("POR") from being subject to the adverse rate.

*Jurisdiction and Standard of Review*

Jurisdiction is predicated upon 19 U.S.C. §1516a(a)(2)(B)(iii) and 28 U.S.C. §1581(c). Commerce's final results are to be sustained unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law". 19 U.S.C. §1516a(b)(l)(B)(i).

*Discussion*

I

First briefed is the plaintiffs' challenge to the selection of the surrogate value ("SV") for the Fangda Group's forming scrap by-product created during and reintroduced into the production of the subject merchandise.

A

"Normal" value for products from a non-market economy country is typically determined on the basis of surrogate values selected for the factors of production ("FOPs") utilized in producing the merchandise, plus amounts for general expenses, the cost of containers, coverings,

and other expenses, and assumed profit.  *See* 19 U.S.C. §1677b(c)(1).  Because FOPs are based on

"the values of such factors in a market economy country or countries considered to be appropriate",

*id*., Commerce has discretion in the selection of FOPs, so long as they represent the "best available

information" for using as a surrogate value.  *See* 19 U.S.C. §1677b(c)(1)(B); *see also Nation Ford

Chemical Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

          In that exercise, Commerce relies on one or more surrogate countries that are (A) at

a level of economic development comparable to that of the non-market economy country, and (B)

significant producers of comparable merchandise.  19 U.S.C. §1677b(c)(4).  Commerce will

normally value all FOPs from a single surrogate country source, 19 C.F.R. §351.408(c)(2), and in

the selection of the surrogate country Commerce attempts to seek data representing investigation or

review period-wide prices, prices specific to the input in question, prices that are net of taxes and

import duties, prices that are contemporaneous with the period of investigation or review, and data

that are publicly available.  *See* Import Administration Policy Bulletin No. 04.1: Non-Market

Economy Surrogate Country Selection Process (Dep't of Commerce Mar. 1, 2004).

          The primary raw material inputs for small diameter graphite electrode ("SDGE")

products are calcined petroleum coke and "needle" coke, which is a premium-quality type of

calcined petroleum coke produced only by a small number of specialized producers in the United

States, the United Kingdom, Japan, and the PRC.  Responding to Commerce's requests for

information on its production of SDGEs, Fangda's Group[2] reported separate FOPs for domestic

---

[2] "Collapsed" alongside Fangda during the administrative proceeding were affiliates Beijing Fangda Carbon Tech Co., Ltd., Chengdu Rongguang Carbon Co., Ltd., Fushun Carbon Co., Ltd., and Hefei Carbon Co., Ltd. ("Fangda Group").  IDM at 1 n.1.  *See* 19 C.F.R. §351.401(f).

needle coke,[3] imported needle coke, self-produced calcined petroleum coke (involving raw petroleum coke, labor and electricity inputs) and forming scrap.  Because the Fangda Group's reported market economy POR purchases of needle coke exceeded 33 percent of its total POR purchases of domestic and market economy needle coke,[4] Commerce valued both the reported domestic and market economy needle coke FOPs using the weighted average of the Fangda Group's market economy needle coke purchases during the POR in accordance with the provisions of 19 C.F.R. §351.408(c)(l) that were in effect at that time.  Preliminary SV Mem., CDocs 242-43, at 9-10 and Ex. 3.  *See* Pls' 56.2 Br. at 15 (confidential).  That surrogate value is undisputed here.

All calcined petroleum coke consumed by the Fangda Group in production during the POR was "self-produced" by two of the group's members and another affiliate of the Fangda Group. Commerce valued the self-produced calcined petroleum coke based on its FOPs, consisting of raw petroleum coke, electricity, and labor inputs.[5]  There is no dispute over Commerce's selection of the surrogate values for the reported FOPs for the Fangda Group's self-produced calcined petroleum coke.  *See* Preliminary Analysis Mem. for Fangda Group at 4.  Commerce valued the raw petroleum coke inputs using the average unit value ("AUV ") of imports under Ukrainian HTS item 2713.11

---

[3]  According to the papers, needle coke has a distinct crystalline structure that is necessary for achieving high power, super-high power and ultra-high power performance standards in the highest-quality electrode products.  Generally speaking, the higher the performance standard of a given electrode, the higher will be the needed percentage of needle coke relative to calcined petroleum in the production process, in contrast to "regular" power electrode products that may be manufactured solely with calcined petroleum coke inputs and without incorporating any needle coke.

[4]  *See* Fangda Section D Resp., CDocs 44-61, at Ex. D-6.

[5]  *See* Fangda 2nd Supp. Resp., CDocs 231-39, at Exs. S2-D2, p. 23, and S2-D3, p. 30 (Calcined Petroleum Coke Worksheets).

(raw petroleum coke) equal to $243.8298/MT, valued the reported electricity inputs at 0.8199 Ukrainian Hryvnia ("UAH") per kilowatt hour/MT, and valued the reported direct and indirect labor hours at 16.3033 UAH per hour. Preliminary SV Mem. at Ex. 3, *supra*. Fangda points out that when the surrogate values Commerce selected for raw petroleum coke, electricity, and labor inputs are applied to the FOPs reported by the Fangda Group affiliate for its entire POR production of calcined petroleum coke, based upon the average of monthly UAH/dollar exchange rate during the POR of $0.1220917, the resulting value of its self-produced calcined petroleum coke is a certain, determinable figure between $250 and $450 per metric ton ("benchmark").

The specific issue here disputed concerns the surrogate value for forming scrap, a by-product of SDGE production. Although the antidumping statute does not address the treatment of by-products generated during the production process, from an accounting perspective it is appropriate to offset production costs by the value of such by-products, and towards that end Commerce considers its by-product accounting methodology as consistent with the statute, *see* 19 U.S.C. §1677b(c), as further honed from time to time, *cf. Guangdong Chemicals Import & Export Corp. v. United States*, 30 CIT 1412, 1422, 460 F. Supp. 2d 1365, 1373 (2006) *with, e.g., Juancheng Kangtai Chemical Co. v. United States*, 39 CIT ___, Slip Op. 15-93 (Aug. 21, 2015) at 66-81. Parties requesting the offset have the burden of presenting to Commerce evidence regarding the amount of by-product produced, as well as evidence that the generated by-product is re-used in the production of the subject merchandise or has commercial value, before Commerce will incorporate offsets into the margin calculation. *E.g., American Tubular Prods., LLC v. United States*, 38 CIT ___, Slip Op. 14-116 (Sep. 26, 2014) at 17-18, *appeal pending*, Fed. Cir. No. 2016-1127.

Forming scrap is produced in the initial forming stage of electrode production.[6] Fangda mixes all forming scrap from all power levels of electrode products together, and on this point Commerce emphasizes that there is no record information that indicates the component breakdown of forming scrap when it is reintroduced into the kneading stage of production.  *See generally* Fangda 2d Supp. Sec. D Resp. at Ex. D-1, CDoc 56; *cf.* Pl's USCIT R. 56 Brief at 5-6 *with* Def's Resp. at 9, 11.  Fangda reintroduces its forming scrap at that stage in order to lower its cost of SDGE production.

In the *Preliminary Results*, Commerce identified the Fangda Group's FOPs for forming scrap as a type of calcined petroleum coke by-product, and valued it using the AUV of Ukrainian import data for HTS item 2713.12  (calcined petroleum coke), *i.e.*, $1,820 per MT.  *See* Fangda 2d Supp. Sec. D Resp. at 9 and Ex. 3.  Fangda agreed in its administrative case brief that HTS 2713.12 is the proper category for valuing the forming scrap by-product, but it argued that the Ukrainian AUV is aberrational when compared with its own values for calcined petroleum coke and its needle coke purchases.  *E.g.*, Fangda Admin. Case Brief at 15, CDoc 251.  Fangda did not recommend an alternative methodology for valuing the forming scrap by-product but suggested instead a "building up" methodology based on its self-produced calcined petroleum coke input.

After noting that Fangda did not supply a build-up methodology and  that Fangda did not provide evidence as to the ratio of calcined petroleum coke to needle coke in the forming scrap by-product, Commerce concluded that the data would not support a build-up calculation of the forming scrap value and that selecting a surrogate value that included both calcined petroleum and

---

[6] Fangda Group's production process is apparently similar to that described in *U.K. Carbon and Graphite Co. v. United States*, 37 CIT ___, ___, 931 F. Supp. 2d 1322, 1330-31 (2013).

needle coke would be more specific to the by-product in question. *See* IDM at 31. Continuing to evaluate the surrogate value information from the Ukraine, the primary surrogate country, Commerce then determined that it would be appropriate to value forming scrap using Ukrainian HTS 2713.12 because it is the most product-specific HTS category available. *Id*. at 31-32.

Summarizing, Commerce found that: (a) the record shows that the forming scrap used by Fangda Group contains both needle coke and calcined petroleum coke, (b) Ukrainian HTS 2713.12 covers both products and contains imports of both, (c) Ukrainian import data for HTS 2713.12 are publicly available, contemporaneous to the period of review and duty and tax exclusive, and therefore (d) those data, with an AUV of $1,820/MT, comprise the best available information. *Id*. at 31, 36. Commerce further determined that the record did not indicate the ratio of calcined petroleum coke to needle coke in the forming scrap, and that the Ukrainian value for HTS 2713.12 did not contain a small quantity of imports and was therefore not aberrational. *Id*. at 31-35. Consequently, Commerce continued to use HTS 2713.12 data from the Ukraine to value Fangda's forming scrap by-product.

B

Fangda agrees in principle that forming scrap may be valued using import statistics under HTS item 2713.12, but it argues that the agency's determination to value the Fangda Group's forming scrap using the AUV of $1,820/MT based on the Ukrainian import data for that tariff item "as is" was not supported by substantial evidence and not the best information available for valuing forming scrap.

Fangda first contends the Ukrainian AUV is "skewed" by the needle coke prices reflected in the underlying data and is therefore overinflated as compared with the composition of its forming scrap.  This is so, Fangda argues, because the Fangda Group's forming scrap consists "predominantly" of calcined petroleum coke: all forming scrap from the group's electrode production is mixed together, and for the "vast majority" of its products, more calcined petroleum coke was consumed than needle coke.  Fangda argues that its group provided Commerce the purchase information for all of its FOP inputs as well as the information related to all of its self-produced calcined coke, and that the information clearly showed that the combined production and consumption of calcined petroleum coke in the forming stage (from which point the forming scrap was reclaimed as a by-product) was vastly greater than the consumption of needle coke.  Fangda further argues that the cost of manufacture and production worksheets for the three Fangda production companies corroborated this point, and that based on a reasonably conservative inference of the approximate ratio of calcined petroleum coke to needle coke in its forming scrap, the commercial value thereof should thus at most be substantially less than the premium needle coke price that the Ukrainian AUV "obviously" reflects from the import data for HTS item 2713.12.[7]

Those import data, Fangda argues, are "weighted" with a "higher" proportion of needle coke because the import data from the four needle coke producing countries alone account

---

[7] Fangda juxtaposes the Ukrainian AUV of $1,820 against the Fangda Group's somewhat-higher purchase prices of imported needle coke as well as the data covering the wide range of prices it proposed as surrogate values for valuing calcined petroleum coke ($266 MT to $700 MT), *see* Pls' 56.2 Br. at 14-15, and while Fangda allows that forming scrap may contain varying amounts of needle coke if the earlier production involved electrode products containing needle coke, it also allows that in addition to containing previously reintroduced forming scrap, graphite scrap, modified coal tar pitch and stearic acid, forming scrap obtained from "regular" power electrodes will contain little or no needle coke.

for approximately half the imports into the Ukraine.  Fangda juxtaposes the average prices thereof against the average price of the remaining half of the imports into the Ukraine from the non-needle coke producing countries, and in doing so Fangda argues the Ukrainian AUV more closely approximates a needle coke price, as may be discerned by comparison of the Ukrainian AUV with the Fangda Group's purchases of needle coke.  Fangda argues the AUV of $514.43/MT from South Africa's imports during the POR under HTS item 2713.12 is the best information in the record for valuing forming scrap rather than the Ukrainian import data, since Commerce identified South Africa as a potential surrogate country source and its AUV for HTS item 2713.12 is more reasonably representative of the commercial value of the Fangda Group's forming scrap when juxtaposed between its logically-determined benchmark for calcined petroleum coke, *supra*, and the average price of the Fangda Group's own needle coke purchases.  *See* Pls. 56.2 Br. at 9-13.

The court must conclude Fangda's arguments on the record insufficient to overcome Commerce's surrogate value selection for forming scrap.  Regarding the argument that South Africa's data is "best" for valuing the Fangda Group's forming scrap, if one were to calculate a weighted average based on Fangda's argued benchmark for calcined petroleum coke and the simple average of Fangda Group's needle coke purchase prices in (rough) proportion to Fangda's argued ratio of calcined petroleum coke and needle coke in its group's forming scrap, the resulting figure is significantly higher than the South African AUV for HTS 2713.12, which hardly supports the argument that that AUV is the "best" information on the record for valuing its forming scrap.

Regarding the AUV of the Ukrainian import data, Fangda's arguments do not overcome the absence of information on the record necessary to establish its case.  Fangda argues

that its purchase and consumption information clearly establish the overall average ratio of needle coke and calcined petroleum coke in the forming scrap by-product for the entire POR, but Commerce's expressed concern is regarding the lack of record evidence establishing that ratio for *subject* merchandise, *i.e.*, the relevant subset of the Fangda Group's production, and Fangda does not refer the court to an aspect of the record that would indicate the ratio of inputs in its group's non-subject merchandise forming scrap input that might be used to reconcile the averages for the entire POR production and consumption information for calcined petroleum coke and needle coke and the (implicit) production ratio for subject merchandise as argued by Fangda.

Instead, while claiming that the "vast majority" of its products consume more calcined petroleum coke than needle coke, Fangda allows that "regular" graphite electrodes may be produced without needle coke.  That implies, for example, that production runs of "regular" non-subject merchandise graphite electrodes using only calcined petroleum coke (with concomitant forming scrap produced, mixed together with other forming scrap, and reintroduced during such runs) will necessarily result in increases of the percentage of needle coke and decreases of the percentage of calcined petroleum coke in the remaining needle-coke-to-calcined-petroleum-coke inputs ratio that would be attributable to subject merchandise production runs from Fangda's reported consumption of needle coke and calcined petroleum coke in production during the POR. The process of "mixing of all forming scrap . . . together", Pl's 56.2 Br. at 10, must be one that is continuous throughout the POR (a single or even occasional such mixing during the POR would be risable), but Fangda's papers to the court do not illuminate further on its subject and non-subject merchandise production.

Similarly, Fangda's argument that the Ukrainian data are "heavily skewed toward needle coke", *e.g.*, Pls' Reply at 9, must be placed in context *vis-à-vis* Fangda's arguments regarding the composition of its group's forming scrap. Therein, the argument does not overcome Commerce's concern that without more precise record information as to the composition of forming scrap produced during production runs of subject merchandise, one cannot conclude that the composition of the Ukrainian import data for HTS 2713.12 is distortive. *See*, *e.g.*, Def's Resp. at 12 ("the purchase and consumption information that Fangda provided . . . is limited to subject small diameter electrodes, and does not reflect all electrode production during the period of review"); IDM at 32 ("the forming scrap from the production of different power levels of SDGE production is not kept separate, and that production information does not contain all electrodes produced").

Furthermore, even if Fangda's *arguendo* proportions of calcined petroleum coke and needle coke in forming scrap produced during production of subject merchandise are accurate (from which it might be concluded that the Ukrainian import data are "distortive" because they are not representative of those proportions; *e.g.*, Pls' 56.2 Br. at 10-12), the point would not necessarily result in resort to selection of HTS 2713.12 data pertaining to an entirely different country in contravention of Commerce's preference for selecting surrogate values for FOPs from a single surrogate country. *See* 19 C.F.R. §351.408(c)(2). The solution might involve, for example, conversion of the AUV of the Ukrainian data for HTS 2713.12 from a simple to a weighted average that would reflect Fangda's argued calcined-petroleum-coke-to-needle-coke ratio. But whether that exercise even produces a "better" value for the Fangda Group's forming scrap, at any rate, it is not one that Fangda framed to Commerce, and regardless, the court may not, *sua sponte* or otherwise, "displace the [agency's] choice between two fairly conflicting views", *id.*, because "the possibility

of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620 (1966) (citations omitted).

On the other hand, in evaluating the reasonableness of the AUV of the Ukrainian import data for HTS 2713.12 as a surrogate for approximating the value of Fangda Groups's forming scrap, it is always the case that the "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). In that regard, Commerce's analysis is thin at points to the extent it appears to resolve to *ipse dixit* statements or circular reasoning. For example, even though no party placed information on the record concerning the precise composition in imports of needle coke versus calcined coke under Ukrainian HTS 2713.12 or under the same HTS category of another potential surrogate country, *see* IDM at 31-32, Commerce cannot avoid the not-unreasonable inference that the imports into the Ukraine under HTS 2713.12 likely consisted of roughly half needle coke and half "all other" calcined petroleum coke. *Cf.* IDM at 26 n.108 (acknowledging Fangda's arguments in this regard). Commerce may technically be correct as to the "unknown" percentages of needle coke and calcined petroleum coke among the Ukrainian import data, but this is not an instance of an "unknown unknown;" rather it is an instance of a "known unknown,"[8] *i.e.*, there are indicia on the record of a reasonable range within which those percentages likely fall. *See infra.*

However, given the absence of more precise information regarding the composition of the Fangda Group's forming scrap, the above is of less concern here than Commerce's atypical

---

[8] *Cf.*, *e.g.*, *Yates v. United States*, 135 S.Ct. 1074, ___ (2015) ("Congress enacts catchalls for known unknowns") (internal quotes, brackets, and citation omitted).

response to Fangda's argument that the Ukrainian import data are aberrationally small[9] (*i.e.*, 4,442

MT during the entire POR) as compared to the import data for South Africa (207,682 MT) or those

of Thailand, Indonesia and the Philippines (53,534 MT, 54,204 MT and 61,569 MT, respectively).

The court's understanding is that when considering an allegation that data represent an aberrationally

small quantity, Commerce typically determines whether the price represented thereby (*i.e.*, the

Ukrainian AUV in this instance) is aberrational by comparing it against other sources of market

value.  *See*, *e.g.*, *Shakeproof Assembly Components Division of Illinois Tool Works, Inc. v. United

States*, 23 CIT 479, 485, 59 F. Supp. 2d 1354, 1360 (1999); *Certain Cut-to-Length Carbon Steel

Plate From the PRC*, 62 Fed. Reg. 61964, 61981 (Nov. 20, 1997) (final LTFV determ.) ("[f]or pig

iron, we were unable to use the Indian Monthly Statistics as we determined that the import price was

aberrational because the Indian data was based on a very small quantity and was almost two times

the price of the Indonesian pig iron"); *Hand Tools Final Results, Heavy Forged Hand Tools,

Finished or Unfinished, With or Without Handles, from the PRC*, 60 Fed. Reg. 49251, 49253 (Sept.

22, 1995) (final rev. results) ("we have compared the Indian import statistics to [other] sources of

market value to determine whether the Indian import values are aberrational").  Commerce did not

engage in such an exercise during the administrative proceeding but instead concluded that the

Ukrainian import data for HTS 2713.12 are not aberrationally small by noting, first, that the

Ukrainian import volume for that tariff item is still 61% of the volume of Ukrainian electrode

exports in category HTS 8545.11 (which Commerce concluded does not represent an aberrationally

---

[9]  *See* Pls' 56.2 Br. at 21-22, quoting, *inter alia*, *Shanghai Foreign Trade Enterprises Co. Ltd. v. United States*, 28 CIT 480, 495, 318 F. Supp. 2d 1339, 1353 (2004) (Commerce's practice is normally to "ensure that a small quantity of imports did not produce a price that is aberrational relative to other sources of market value").

small percentage), and second, by observing that in "scale" the volume of Ukrainian imports of HTS 2713.12 represents a "substantial" volume of Ukrainian electrode exports.  IDM at 34.

Commerce does not here enlighten as to the relevance of such a comparison, but the court can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974).  Of course, an administrative determination that does not reflect "economic reality" is unsustainable as unsupported by substantial evidence.  *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F. 3d 1370, 1378 (Fed. Cir. 2013), quoting *Eurodif*, *supra*, 555 U.S. at 317-18. Still, Commerce need not duplicate the exact production experience of a respondent, so long as it chooses, to the extent possible from the record, a surrogate value for the input that most accurately represents the "fair" market value in a hypothetical market-economy picture of the NME relevant to the proceeding. *Nation Ford*, *supra*, 166 F.3d at 1377 (quoting CIT decision).  The "hypothetical" used for that purpose in this instance is the Ukraine -- which, as the domestic industry here points out, accorded with the plaintiffs' request not only to include the Ukraine among Commerce's list of countries determined to be at a level of economic development comparable to the PRC but also to select it as the primary surrogate country in the review.   Def-Ints' Resp. at 4, referencing Respondents' Surrogate Country Cmts (Aug. 21, 2013), PDoc 88, at 2.

Obviously, Fangda had second thoughts on the Ukraine's selection as the primary surrogate country when it came to the forming scrap surrogate value selection, and Fangda here claims it proved the Ukrainian import volume aberrationally small via comparison thereof with the import volumes of the other potential surrogate countries as well as based on Fangda's own analysis

of price.  *See* Pls' Reply at 3.  According to the IDM, however, Fangda was only able to identify the

import value by metric ton and total price from each of the "dominant" needle coke producing

countries (the United States, the United Kingdom, and Japan), IDM at 32-33, and

> [i]mports from these countries into [the] Ukraine amount to 50 percent[ ] of the
> Ukrainian summary quantity of HTS 2713.12 and have an average unit value of
> 2,703 USD/MT while the Ukrainian value [*i.e.*, AUV] of HTS 2713.12 is 1820.86
> USD/MT.  Also, Fangda Group attempts to quantify the makeup of Ukrainian HTS
> 2713.12 by comparing the ratio of import values to quantities from each of these
> countries to the weighted average market economy price we established for needle
> coke based on Fangda Group market economy purchases.  Fangda Group then
> attempts to conclude that all imports from these countries are so valuable that they
> must all be needle coke. If the same logic is applied to South African imports of HTS
> 2713.12[,] we find that 52 percent of imports come from a dominant provider of
> needle coke, the United States,[ ] and the average unit value of these imports is 557
> USD/MT while the South African value of HTS 2713.12 is 510 USD/MT.

IDM at 33 (footnotes omitted).

At least in that regard, Fangda's logic appeared flawed to Commerce.  Fangda here,

however, stresses: that the AUVs for HTS 2713.12 for South Africa, Indonesia, the Philippines, and

Thailand ranged from $161.39/MT to $605.19/MT, or between one-tenth and on-third of the

Ukranian AUV; that its group's total purchase volume of raw petroleum coke (for processing into

calcined petroleum coke), calcined petroleum coke, domestic needle coke, and imported needle coke

was over 40 times that of the Ukrainian import volume during the POR; that the administrative

record established that under HTS 2713.12, the AUVs for Indonesia, the Philippines, and Thailand

were each based upon sample sizes 12 times greater than the Ukrainian sample size; and also that

the South African AUV was based upon a sample size almost 50 times greater than the Ukrainian

AUV.  *See* Respondents' Post-Preliminary Surrogate Value Submission at Ex. 2; PDoc 231.  Those

points, however, shed only dim light on the reasonableness of relying upon the Ukrainian AUV and

none on the proportions of calcined petroleum coke and needle coke among those countries' imports under HTS 2713.12 or on the underlying variation in the values thereof, nor do they conclusively prove that the Ukrainian AUV is a statistical outlier in the trade of HTS 2713.12 imports. The fact that the Ukrainian AUV may be "the" outlying value among those countries on Commerce's primary surrogate country list is an accident of the surrogate valuation process, from a particular country, and over a particular time period, but that is not, in and of itself, a reason for rejecting that value.

        The real question then, in accordance with Commerce's "typical" consideration of an aberrational volume assertion, is whether the Ukrainian import data represent non-aberrational commercial values, not simply the country-wide volume itself. *See*, *e.g.*, *Shakeproof*, *supra*; *cf*. Pls' Reply at 7. And on that question, the fact of the matter is that Commerce had to consider, in addition to its preference for data are publicly-available, contemporaneous with the period of review, tax-exclusive, reflective of broad market averages, and representative of FOPs from the primary surrogate country, the Ukrainian import data in light of the fact that the forming scrap input is itself a hybridization of a number of other inputs including calcined petroleum coke and needle coke. *See* IDM at 31, 36. If "the process of constructing foreign market value for a producer in a nonmarket economy country is difficult and necessarily imprecise", *Sigma Corp. v. United States*, 117 F.3d 1401, 1408 (Fed. Cir. 1997) (discussing predecessor provision of normal value), then multiple variables necessarily introduce an even greater level of complexity and imprecision into the analysis of selecting a single surrogate FOP therefor.

        As Fangda points out, the record reflects a range of values for the inputs that comprise forming scrap against which to evaluate the Ukrainian value(s) of the import data for HTS 2713.12,

but not all of them would meet Commerce's selection criteria.  Fangda emphasizes that the Ukrainian imported needle coke prices are approximately $2,703/MT on average, which far exceeded the average of its own group's market economy purchase prices of needle coke, but as Commerce also pointed out, Fangda's conclusions as to the price differential at this point, resting largely on its own purchases of needle coke, reflect isolated transactions between Fangda and its needle coke suppliers rather than broad market averages.  Fangda's own purchase prices reflect its own "economic reality," but they are not dispositive of the reasonableness of using the Ukrainian data for HTS 2712.12 as a surrogate for the value of forming scrap, which also reflect "economic reality" (of the "fair" market values of the chosen "hypothetical" market economy's mix of calcined petroleum coke and needle coke within the HTS item number that Fangda agrees is the appropriate item for seeking a surrogate value for forming scrap).  *See Nation Ford*, *supra*, 166 F.3d at 1377.

As coda, the defendant also emphasizes that Fangda's arguments do not take into account the value added by other material inputs within forming scrap (such as stearic acid -- which surrogate value Commerce determined to be $1,803.40/MT -- *see* Prelim. SV Memorandum, CDocs 242-43 at Ex. 3), as well as labor and electricity.  *See, e.g.*, Def's Resp. at 11; IDM at 32.  The court acknowledges it would not be inappropriate to conceptualize the value of forming scrap as represented by more than simply the separate proportional values of calcined petroleum coke and needle coke, but the bottom line here is that given the absence of precise information as to the composition Fangda's forming scrap and of the ranges and variation on the record of the values of calcined petroleum coke and needle coke as compared with the ranges of those values among the Ukrainian import data, *see, e.g.*, Pls' 56.2 Br. at 13-14, it cannot be concluded that the Ukrainian

AUV of $1,820 for HTS 2712.12 is significantly overstated or "skewed" as a surrogate for Fangda's

forming scrap, because the standard of review is one of substantial record evidence.

In the final analysis of the relief Fangda seeks, by arguing for the South African AUV,

Fangda is fundamentally asking the court to reweigh the evidence or substitute its own analysis or

judgment thereon, which the court may not do in the absence of a reason from the record therefor

without intruding into Commerce's domain. *See, e.g.*, *Downhole Pipe & Equipment, L.P. v. United

States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015), referencing *Trent Tube Division, Crucible

Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992). *Sub silencio*, the

court has considered Fangda's remaining arguments on the issue and finds them to be similar in

effect, by asking the court to reweigh or substitute a different analysis of the record. Thereby, they

do not overcome Commerce's "broad discretion to determine 'the best available information' in a

reasonable manner on a case-by-case basis." *Timken Co. v. United States*, 26 CIT 434, 438, 201 F.

Supp. 2d 1316, 1321 (2002) (citation omitted). Commerce selected an HTS category that reflected

the two primary components of forming scrap (needle coke and calcined petroleum coke), it

evaluated the Ukrainian import data therefor, and it concluded that they were not aberrational.

Substantial evidence of record supports Commerce's determination, and the court will not "second

guess" the agency on the issue. *Cf. JTEKT Corp. v. United States*, 642 F.3d 1378, 1382 (Fed. Cir.

2011); *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1339 (Fed. Cir. 2006).

II

The statute authorizes a deduction from U.S. price equal to "the amount if included

in such price, of any export tax, duty, or other charge imposed by the exporting country on the

exportation of subject merchandise to the United States". 19 U.S.C. §1677a(c)(2)(B). On this point, the plaintiffs argue Commerce's deduction from their U.S. price to account for the unrefunded portion of PRC domestic VAT taxes upon their exports to the United States is contrary to law. Pls' 56.2 Br. at 25-32. The IDM explains that the deduction is consistent with *Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 Fed. Reg. 36481 (June 19, 2012) ("*Methodological Change*"), which recognized that the PRC's VAT operates differently than a typical VAT, pursuant to which companies typically either receive a full rebate of the VAT upon export or may credit the VAT paid on input purchases against the VAT the companies collect from their domestic sales. The IDM explains that the unrefunded (or irrecoverable) portion of the PRC VAT amounts to a "tax, duty or other charge imposed on exports that is not imposed on domestic sales." IDM at 23.

The plaintiffs argue that the holdings of *Magnesium Corporation of America v. United States*, 166 F.3d 1364 (Fed. Cir. 1999) ("*Magnesium Corporation*") still control, *i.e.*, that the "plain meaning" of the relevant statutory language was consistent with Commerce's previous interpretation of the statutory provision and "prohibited" Commerce from making any deduction from U.S. price to account for export taxes, duties, or charges imposed by non-market economy ("NME") countries as defined by 19 U.S.C. §1677(18), and that this court recently affirmed Commerce's previous interpretation that this statutory provision "prevented" Commerce from

adjusting U.S. price on account of the PRC's VAT, ruling that this issue had been "resolved long ago"[10] by the CAFC in *Magnesium Corporation*.

The plaintiffs misinterpret.  The relevant appellate decision found "plain" that the language of the statute does not require all export taxes to be deducted from the U.S price but requires only deduction of those amounts that are included in the price of the merchandise; hence, whether VAT and export taxes are included in, and should be deducted from, the U.S. price is within Commerce's discretion to determine.  *Magnesium Corporation*, 166 F.3d at 1370-71.

At any rate, the plaintiffs agree that change in administrative practice is permissible if a reasoned explanation is provided for the change.  They argue, however, that Commerce cannot change practice or interpret the statute contrary to the plain language of the statute.  *Dorbest v. United States*, 604 F.3d 1363, 1371 (Fed. Cir. 2010).  Specifically, they contend that the plain terms of the stature require an "export tax, duty or other charge" that is "imposed by the exporting country", 19 U.S.C. §1677a(c)(2)(B), and that the PRC's VAT is an internal tax only that by definition is not "imposed" upon export of the subject merchandise.  They also argue that the statute only permits Commerce to deduct from U.S. price "the amount if included in such price" and that neither the final results nor the response briefs submitted by the opposition explain how the non-receipt of the refund of internal VAT taxes is reflected in the U.S. price of the subject merchandise, and that nothing in the administrative record establishes that the PRC's VAT was "added" to the invoiced sales price to Fangda's U.S. customers.  Pls' 56.2 Br. at 30; Pls' Reply at 12.  Similar contentions, however, were addressed at length in *Methodological Change*:

---

[10] *Globe Metallurgical, Inc. v. United States*, 35 CIT ___, ___, 781 F. Supp. 2d 1340, 1348 (2011).

In adopting this methodological change, the Department considers taxes levied by the [PRC] and Vietnamese governments to be different from other internal transactions between companies in an NME context.  Although we do not know how individual companies in those NME countries set prices, we do know that the government taxes a portion of companies' sales receipts.  Consistent with our CVD determinations in *CFS Paper* and *PRCBs*, we can measure a transfer of funds between certain NMEs and companies therein, regardless of the direction the money flows.  Given that, and given that we know how much respondent companies receive for the U.S. sale, we have determined it appropriate to take taxes into account, as directed by the statute. *See* section 772(c)(2)(B) of the Act.

Specifically, the statute defines an NME as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  *See* section 771(18) of the Act.  As a result, when the Department evaluates whether a tax is included in the price of an NME export sale, it cannot take into consideration the same assumptions as those taken into account when performing a similar type of evaluation for a market economy sale, which does operate in accordance with market principles of cost or pricing structures. Accordingly, it is not an issue of price formation (*i.e.*, whether the seller considers tax when forming price) because that is a market economy concept which is inapplicable by the very definition of an NME.

Additionally, because these are taxes affirmatively imposed by the [PRC] and Vietnamese governments, we presume that they are also collected.[ ]  The unrefunded VAT or affirmatively imposed export tax only arises through the fact that there were export sales.

As a result, because the liability arises as a result of export sales, this is where payment originates.  Therefore, to achieve what is called for in the statute, the gross price charged to the customer must be reduced to a net price received.  In cases involving imports from the PRC or Vietnam, "included in the price" means whether the respondent has reported a price which is gross (*i.e.*, inclusive) or net (*i.e.*, exclusive) of tax.  As such, if a gross price has been reported, a deduction must be made for those taxes imposed on the sale, and if a net price has been reported, deductions are not required.  We note that, in prior cases involving imports from the PRC or Vietnam where the Department was aware that such a tax was imposed, it has typically been expressed as a percentage of the export selling price.  Therefore, any such deduction to export price would also be performed on a percentage basis.

We further note that deducting internal NME tax transactions from export price or constructed export price is consistent with the Department's longstanding policy,

which is consistent with the intent of the statute, that dumping comparisons be tax-neutral. *See Antidumping Duties; Countervailing Duties*, 62 FR 27296, 27369 (May 19, 1997) (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, 827, reprinted in 1994 U.S.C.C.A.N. 3773, 4172).

In response to comments that the methodological change does not consider other cost elements that are presumed to be reflected in a price from a market economy country, but not from an NME country, we note that the new methodology does not consider other elements of cost or price because, pursuant to section 773(c)(1)(B) of the Act and consistent with the PRC's and Vietnam's Protocols of Accession to the World Trade Organization ("WTO"), the Department can reject internal costs and prices in an NME country for antidumping and countervailing duty purposes. What is relevant for margin calculation purposes is the net revenue the company ultimately receives on sales made to its U.S. customers, after adjusting for taxes, as provided for by the statute.

*Methodological Change,* 77 Fed. Reg. at 36483.

The plaintiffs, however, contend that Commerce's and the defendant-intervenors' explanation (that the agency's interpretation is permissible because the PRC is not a Soviet-style NME)[11] is "utter nonsense" because the relevant statutory provisions, 19 U.S.C. §1677a(c)(2)(B) and 19 U.S.C. §1677(18), do not contemplate "different levels of NME status": a country is either an NME or it is not an NME. Likewise, the plaintiffs criticize the *Final Results'* explanation of the statute's encompassing of irrevocable VAT as "a cost that arises as a result of export sales", *IDM* at 23, because "[t] he whole purpose of the statute's NME methodology statute is to disregard prices and costs incurred in the production and sale of the subject merchandise that were incurred in the NME country". Pls' Reply at 13, referencing 19 U.S.C. §1677a(c).

The court disagrees that "disregard" is accurate or necessarily (depending upon circumstances) appropriate. First, the plaintiffs' points appear addressed more towards the

---

[11] *See* Def's Resp. at 17-19; Def-Ints' Resp. at 30.

determination of the "normal value" ("NV") of a product of an NME country, not U.S. price.  NMEs are specified in the NV statute, 19 U.S.C. §1677b(c)(1)(B), not in the U.S. price statute, 19 U.S.C. §1677a(c)(2)(B),  and the NV statute explicitly permits the addition of "other expenses" to the FOP methodology.  Second, with regard to U.S. price, neither the governing statute nor its legislative history defines "export tax, duty or other charge imposed" for the purpose of adjusting U.S. price, which is aside from the import of the terms "if included in the price" in the statute that were held unambiguous (in the sense of the relevant amount either being included or not included in such price) by *Magnesium Corporation*.  Commerce reconsidered its interpretation and concluded that "export tax, duty or other charge imposed" includes VAT that is not fully refunded upon exportation and also that whether a deduction therefor is required depends upon whether the price is reported on a gross or net basis.  77 Fed. Reg. at 36482-83.  *Cf.* 19 U.S.C. §1677a(c)(2)(B) ("if included in the price").  Such a methodological update, achieved through notice and comment, compels *Chevron* deference.  *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009), referencing *United States v. Mead Corp.*, 533 U.S. 218, 229  230 (2001) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).  On this issue, the plaintiffs do not persuade that deduction of the portion of the PRC's VAT that was unrefunded or irrecoverable upon export of their subject merchandise to the United States was contrary to law and not supported by substantial evidence.

III

The third issue argued by the plaintiffs concerns Commerce's determination to apply total adverse facts available ("AFA") to Fushun.  *See* IDM at 8-13; AFA Memo at 1-14.  The statute authorizes Commerce to use "facts otherwise available" if the record lacks necessary information,

if a party withholds information Commerce requested, fails to provide information in a timely manner or in the form or manner Commerce requested, significantly impedes the proceedings, or provides information that cannot be verified.  19 U.S.C. §1677e(a).  Commerce may disregard all of the information a party submits and determine the party's dumping margin using "total" facts otherwise available when the deficiency affects the reliability of all or most of a respondent's submissions.  *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1357 (Fed. Cir. 2015); *Jiangsu Changbao Steel Tube Co. v. United States*, 36 CIT ___, ___, 884 F. Supp. 2d 1295, 1302 (2012), citing *Shanghai Taoen Int'l Trading Co. v. United States*, 29 CIT 189, 193 n.13, 360 F. Supp. 2d 1339, 1348 n.13 (2005)).  Further, Commerce can apply an adverse inference under 19 U.S.C. §1677e(b) if an interested party "has failed to cooperate by not acting to the best of its ability to comply with a request for information".  *See also Ad Hoc Shrimp*, 802 F.3d at 1357.

During the administrative proceeding, Commerce applied total AFA after considering the totality of Fushun's responses on the initial question of whether Fushun's U.S. sales involved any resellers during the POR.  By way of brief background, during the prior three administrative reviews Fushun dealt with one of its customers in the United States directly and informally (*i.e.*, orally).  During this fourth administrative review, Fushun continued such dealings with this customer as to most contractual terms including price, but payment to Fushun was to be handled by another company assisting Fushun's customer.  Fushun initially reported the new arrangement as a single hyphenated-entity consisting of its customer and the new company making payment(s).  Upon further questioning by Commerce, Fushun provided copies of two written contracts it had executed with the paying company to Commerce as part of Fushun's second supplemental questionnaire response as

well as a full explanation (with apologies for any confusion that arose as to its prior responses to Commerce's questions) regarding reseller arrangements.  *See Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties*, 76 Fed. Reg. 65694 (Oct. 24, 2011) (reseller policy).

Here, the court must observe that the reseller policy appears concerned only with the proper margin for "non-reviewed entries," which margin depends upon whether record evidence indicates a producer or exporter knew or should have known that its sales to a third party (or reseller) were destined for the United States. *See generally id*.  That is apparently not the case on this record, as Fushun clearly knew that its sales to the particular U.S. customer were destined for the United States notwithstanding the involvement of the paying company (or "reseller"), and Fushun reported the relevant sales on its U.S. sales database to Commerce.  The AFA problem before the court, however, encompasses more than the arguable initial confusion Fushun may have experienced in attempting to describe to Commerce its sales to the relevant U.S. customer, with whom Fushun's apparently cordial business relationship spanned years.

The plaintiffs' papers present a (mostly) compelling recap of relevant events from Fushun's perspective, but, and without delving here into the myriad (and mostly confidential) arguments the parties present on the AFA issue, the basic problem, from Commerce's perspective, was that the issue had "morphed" over time during the administrative proceeding.  In particular, in the process of responding to Commerce's questionnaires, Fushun also provided certain documentation that showed a discrepancy on an important sale term, which Fushun claimed was created at the behest of its customer as a result of advice the customer had received from a customs

broker regarding the reseller policy.  That advice turned out to be erroneous, as such documentation was unnecessary for the customer to import the subject merchandise at the cash deposit rate set for Fushun.

Be that as it may, after considering the totality of record, including the inconsistencies of Fushun's section A, section C, first supplemental, and second supplemental responses, Commerce determined that Fushun withheld information that Commerce had requested, failed to provide information in the form or manner Commerce requested, impeded the proceeding, and provided information that could not be verified.  IDM at 8-11; AFA Memo at 1-13; 19 U.S.C. §1677e(a)(A), (C), (D).  In light of the administrative memorandum on the subject (with record citations therein) the court cannot conclude Commerce's determination on the issue unsupported by substantial evidence or not in accordance with law.  The Federal Circuit has held that withholding key information or providing false information "unequivocally" demonstrate that a party did not put forth its "maximum effort."  *Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012).

IV

The penultimate issue concerns the plaintiffs' arguments that Fushun should be entitled to a separate rate.  The arguments are unpersuasive.  Unlike *Qingdao Taifa Group Co. v. United States*, 33 CIT 1090, 637 F. Supp. 2d 1231 (2009), *aff'd*, 467 Fed. Appx. 887 (Fed. Cir. 2012), to which Fushun refers for support, *see* Pls' 56.2 Br. at 42, Fushun failed to "establish[ ] independence from government control"[12] and therefore eligibility for a separate rate, given its original section A and supplemental section A responses that were deemed unreliable.  *See* PDM at

---

[12]  *See Qingdao Taifa,* 33 CIT at 1098, 637 F. Supp. 2d at 1240-41 (citation omitted).

4-7; AFA Memo at 14.  Because Commerce uses total facts available "in situations where none of the reported data is reliable or usable", *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011), discussing *Steel Authority of India, Ltd. v. United States*, 25 CIT 472, 149 F. Supp. 2d 921 (2001), Commerce applies in such situations the presumption of government control as well as the PRC-wide rate.  *See Ad Hoc Shrimp*, *supra*, 802 F.3d at 1356-57.  Commerce's application thereof in this instance was in accordance with law.

V

Last addressed is the plaintiffs' request for equitable relief for one of Fushun's importers.  The issue involves certain entries that Fushun claimed in its administrative case brief as pertaining to purchases of subject merchandise during the previous administrative review that did not enter the United States until this fourth administrative review.  The basis for this claim was predicated upon certain data from U.S. Customs and Border Protection ("CBP") for the POR on the record.  Commerce rejected Fushun's case brief on the ground that it involved "new factual information", *see* IDM at 2-3, and Commerce here contends the issue should be dismissed because it involves the factual information that should have been submitted at least 30 days prior to the preliminary determination, *i.e.*, March 24, 2014.  *See* 19 C.F.R. §351.301(c)(3)(ii).  Commerce argues that because Fushun did not do so, these "new" arguments should be disregarded for failure to exhaust administrative remedies.

The plaintiffs contend that the issues raised in Fushun's case brief were "legal," not factual.  Pls' 56.2 Br. at 43-44.  Commerce insists, however, that the plaintiffs do not cite to any statutory or regulatory provision that would provide relief for Fushun's importer under this set of

circumstances, they simply rely on the assertion that the sales relevant to their claim were made during the previous review period and lack record evidence showing a connection between this importer, the date of sale that the plaintiffs proffer, and the entries identified among the CBP data. Commerce contends that the plaintiffs would have needed to substantiate the conclusion they draw from the data in Fushun's United States Sales Listing, CDoc 32, to the amount of the particular type of entries they contend are listed in the CBP data, CDoc 2, by submitting actual evidence, but the time for submissions of factual information had already passed, and that without such record evidence it would be mere speculation concerning the entries in question.  In short, Commerce contends it simply could not rely upon the unsubstantiated statements made by Fushun's counsel. Def's Resp. at 44-45, citing *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) and *Home Meridian International Inc. v. United States*, 36 CIT ___, ___, 865 F. Supp. 2d 1311, 1322 (2012), *reversed in part on other grounds*, 772 F.3d 1289 (Fed. Cir. 2014).

All of which, however, is rather academic, because the law governing this issue is explicit, as outlined in the defendant's confidential response to the plaintiffs' brief on their USCIT Rule 56.2 motion.  Fushun's entries therefore appear to have been properly assessed.

### *Conclusion*

There appearing to be no grounds for the relief requested, a separate judgment dismissing this action will be entered concurrently herewith.

/s/  R. Kenton Musgrave
R.  Kenton Musgrave, Senior Judge

Dated:  March 23, 2016
           New York, New York